| EILEEN GRANIER, ET AL | * | NO. 2019-CA-0657 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| LEXINGTON INSURANCE | * | |
| COMPANY, ET AL. | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2014-06599, DIVISION "L-6"
Honorable Kern A. Reese, Judge
* * * * * *
**Judge Daniel L. Dysart**
* * * * * *

(Court composed of Chief Judge James F. McKay, III, Judge Daniel L. Dysart, Judge Dale N. Atkins)

Tracey Rannals
RANNALS LAW FIRM
400 Poydras Street, Suite 900
New Orleans, LA 70130
     COUNSEL FOR PLAINTIFF/APPELLANT

James P. Waldron
Peter E. Sperling
FRILOT L.L.C.
1100 Poydras Street, Suite 3700
New Orleans, LA 70163-3700
     COUNSEL FOR DEFENDANT/APPELLEE

AFFIRMED

DECEMBER 27, 2019

This is a medical malpractice action was dismissed by the trial court on a peremptory exception of prescription. Based on our review of the record, we find that the trial court correctly granted the exception of prescription and accordingly, we affirm the trial court's judgment.

**FACTS AND PROCEDURAL HISTORY**

On September 28, 2010, plaintiff, Eileen Granier, and her husband, Brett Granier, filed a claim with the Division of Administration seeking a medical review panel to investigate her treatment with defendant, Dr. Vernon Carriere. She asserted that, on September 29, 2009, Dr. Carriere "performed a laparoscopy which was converted to a laparotomy, with left salpingo-oophorectomy" and that during the procedure, "the left sigmoid colon was denuded and Dr. Carriere attempted a repair."

On October 3, 2009, Ms. Granier was readmitted to East Jefferson General Hospital for an emergency "laproscopic [sic] exploration, colostomy, and abdominal washout." She then suffered other conditions, including ARDS, was placed on a ventilator, and remained in the ICU for eight days, during which time "a percutaneous drain was placed." Ms. Granier was transferred to St. Theresa's

1

Long Term Acute Care Center on October 26, 2009, where she remained until November 29, 2009. Since that time, Ms. Granier has suffered complications, requiring additional treatment.

In their medical review panel claim, plaintiffs alleged that Dr. Carriere breached the standard of care when he "failed to consult with a general surgeon or colo-rectal [sic] surgeon intraoperatively, to evaluate and repair the injury to [her] bowel." They further maintained that he "failed to give the appropriate post-operative instructions or provide proper post-operative management to Ms. Granier" and that his failures "nearly resulted in the death of Ms. Granier, and have caused long term and irreversible complications."

On December 20, 2011, more than a year after invoking the medical review panel, and more than two years after Ms. Granier was treated by Dr. Steven Jones, plaintiffs amended their original request for a medical review panel to name Dr. Steven Jones as a defendant. In their supplemental claim, plaintiffs alleged that Dr. Jones examined Ms. Granier on October 2, 2009, "diagnosed a post-operative illus [sic] and recommended GI rest." Plaintiffs alleged that Dr. Jones had the benefit of prior multiple diagnostic tests (chest and abdominal x-rays and an abdominal CT scan) "which were highly suggestive of a bowel perforation." Likewise, Ms. Granier exhibited symptoms of a bowel perforation. Plaintiffs claimed that "Dr. Jones failed to diagnose a perforated bowel until October 3, 2009," resulting in Ms. Granier's developing "acute respiratory distress syndrome and a worsening clinical picture." Because of Dr. Jones' alleged delay in diagnosing her and subsequent surgery, plaintiffs alleged, Ms. Granier "suffered a decreased chance of a better outcome."

The medical review panel rendered its opinion on April 4, 2014, finding that "[t]he evidence does not support the conclusion that . . . [Drs. Carriere and Jones] failed to meet the applicable standard of care as charged in the complaint."

Plaintiffs then instituted this action in the Civil District Court on July 7, 2014 against Drs. Carriere and Jones, and their respective professional liability insurers, Lexington Insurance Company and Health Care Indemnity, Inc.

On May 21, 2015, Dr. Carriere and Lexington filed a Motion for Summary Judgment seeking to be dismissed from the lawsuit on the basis that the plaintiffs would be unable to sustain their burden of proof that Dr. Carriere breached the standard of care required of him in his treatment of Ms. Granier, or that any action on his part resulted in injury to Ms. Granier. The record does not reflect that a response was filed in opposition to the motion for summary judgment or that counsel for plaintiffs participated in the hearing on the motion. By judgment dated August 14, 2015, the trial court granted the summary judgment motion, dismissing the action against Dr. Carriere with prejudice.

On January 17, 2019, Dr. Jones and Health Care Indemnity, Inc. (collectively referred to as "Dr. Jones") filed a peremptory exception of prescription. After a hearing on the matter, the trial court granted the exception of prescription by judgment dated May 20, 2019.

This appeal followed.

### Standard of Review, Generally

Ordinarily, a judgment sustaining a peremptory exception of prescription is reviewed *de novo* by an appellate court. *Kirt v. Metzinger*, 19-0180, p. 4 (La. App. 4 Cir. 6/19/19), 274 So.3d 1271, 1273 ("Appellate courts assess the legal correctness of an exception of prescription under a *de novo* standard review.").

3

However, "'[w]hen prescription is raised by peremptory exception, with evidence being introduced at the hearing on the exception, the trial court's findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review.'" *In re Med. Review Panel of Hurst*, 16-0934, p. 4 (La. App. 4 Cir. 5/3/17), 220 So.3d 121, 125-26, *writ denied*, 17-0803 (La. 9/22/17), 228 So.3d 744, (quoting *Specialized Loan Servicing, L.L.C. v. January,* 12-2668, pp. 3-4 (La. 6/28/13), 119 So.3d 582, 584). *See also*, *Ferrara v. Starmed Staffing, LP*, 10-0589, p. 4 (La. App. 4 Cir. 10/6/10), 50 So.3d 861, 865 ("[w]hen evidence is introduced and evaluated at the trial of a peremptory exception, an appellate court must review the entire record to determine whether the trial court manifestly erred with its factual conclusions.").

**DISCUSSION**

The sole issue presented in this appeal is whether the trial court properly granted Dr. Jones' exception of prescription.

In the context of a medical malpractice case, an action must be "filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect." La. R.S. 9:5628 A. Such an action is commenced by invoking a medical review panel pursuant to La. R.S. 40:1231.8.

As a general rule, the burden of proving that a cause of action has prescribed rests with the party pleading prescription; however, when "prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed." *Jones v. State*, 04-0717, p. 3 (La. App. 4 Cir. 9/29/04), 891 So.2d

4

698, 701. As this Court recently recognized, where a complaint "sets forth no 'facts alleged with particularity . . . to show that [a plaintiff] was unaware of the malpractice prior to the alleged date of discovery' . . . [and the] complaint was filed more than one year after the date of the alleged malpractice, [a] complaint, on its face, is prescribed [and] the burden shift[s] to [the plaintiff] to show that [the] action is not prescribed." *Hurst*, 16-0934, pp. 5-6, 220 So.3d at 126.

Here, the request for a review of Dr. Jones' treatment of Ms. Granier was made more than two years after Dr. Jones treated her. The request sets forth no "particularized" facts which demonstrate the date of the plaintiffs' discovery of the alleged malpractice or any explanation as to why Dr. Jones was being added as a defendant at such a late date. Accordingly, on its face, the claim against Dr. Jones was untimely filed and the burden shifted to plaintiffs to show that it had not prescribed. To meet this burden, the plaintiffs necessarily were required to show "the suspension, interruption or renunciation of prescription." *See Jones*, 04-0717, p. 3, 891 So.2d at 701. In other words, for the claim against Dr. Jones to have been timely, it must either fall within the purview of La. R.S. 40:1231.8 A(2)(a), which provides for the suspension of prescription against all joint and solidary obligors,[1] or have an independent basis for timeliness.

---

[1] La. R.S. 40:1231.8 A(2)(a) provides, in pertinent part, that "[t]he filing of a request for review of a claim shall suspend the running of prescription against all joint and solidary obligors, and all joint tortfeasors, including but not limited to health care providers, both qualified and not qualified, to the same extent that prescription is suspended against the party or parties that are the subject of the request for review." *See also*, *Ferrara v. Starmed Staffing, LP*, 10-0589, p. 3 (La. App. 4 Cir. 10/6/10), 50 So.3d 861, 864, ("the filing of a medical malpractice claim with a medical review panel triggers the suspension of prescription specially provided by the [Medical Malpractice Ace], rather than the interruption of the liberative prescriptive period generally provided in the Civil Code."); *Graham v. St. Charles Gen. Hosp.*, 590 So.2d 818, 821 (La. App. 4 Cir. 1991)("the filing of a claim with the medical review panel suspends prescription with regard to non-named solidary obligors to the same extent that it is suspended for those named in the request for review by the panel.").

Plaintiffs cannot rely on the suspension of prescription against solidary obligors provisions if La. R.S. 40:1231.8 in this case. Although the medical review panel proceeding was timely commenced against Dr. Carriere, those claims were dismissed from this case on a motion for summary judgment, the basis of which was plaintiffs' inability to meet their burden of proving "that there was a deviation from the standard of care and a causal connection between the allegations of Dr. Carriere's malpractice and the damages sustained by Ms. Granier." Our jurisprudence reflects that "where no liability is found on the part of a timely sued alleged tortfeasor, prescription will not be interrupted or suspended as to another tortfeasor, who is not timely sued, since no joint or solidary obligation exists." *Ferrara v. Starmed Staffing, LP*, 10-0589, p. 5 (La. App. 4 Cir. 10/6/10), 50 So.3d 861, 866. *See also*, *Sims v. Am. Ins. Co.*, 12-0204, pp. 6-7 (La. 10/16/12), 101 So.3d 1, 6 ("while prescription is interrupted by suit against one solidary obligor or joint tortfeasor as to the other solidary obligors and joint tortfeasors not timely sued, . . . where the timely sued defendant is ultimately found not liable to plaintiffs, the suit against the untimely sued defendants will then be dismissed, because no joint or solidary obligation would exist."). Accordingly, because Dr. Carriere was dismissed with prejudice from this action, prescription was not suspended as to Dr. Jones as there is no joint or solidary obligation.

Plaintiffs' position in this matter is that the suit against Dr. Jones was instituted "within one year from the date of [the] discovery" of his "alleged act, omission, or neglect" as contemplated by La. R.S. 9:5628 A. They contend that, during the course of the medical review panel proceeding, Dr. Carriere's deposition was taken and plaintiffs learned for the first time that Dr. Carriere had

spoken with Dr. Jones on October 2, 2009, the day that she first saw Dr. Jones. In that conversation, plaintiffs argue, Dr. Carriere provided Dr. Jones with sufficient information for Dr. Jones to have known that Ms. Granier was suffering from a bowel perforation. Thus, plaintiffs maintain that Dr. Jones was well aware that Ms. Granier was not suffering from an ileus, as he initially diagnosed, and should have immediately transferred her for emergency surgery. The one-day delay in her surgery, plaintiffs argue, led to further complications and a worsening of Ms. Granier's condition.

Plaintiffs maintain that they were unaware of the October 2, 2009 conversation between Drs. Carriere and Jones until Dr. Carriere's deposition had been taken. They likewise were unaware until then that Dr. Carriere had notified Dr. Jones that he had injured Ms. Granier's bowel for two reasons. First, Dr. Carriere went out of town on the day of her surgery and did not complete his operative report for ten days.[2] Second, nothing in the medical records reflected that Dr. Carriere had spoken with Dr. Jones on October 2. Therefore, plaintiffs argue, they could not have known that Dr. Jones negligently delayed Ms. Granier's surgery until Dr. Carriere's deposition had been taken.

Our jurisprudence is well-settled that the "discovery" rule provided by La. R.S. 9:5628 A is an exception to the general rule that medical malpractice actions must be commenced within one year of the date of the alleged malpractice. *In re Med. Review Panel for Claim of Moses*, 00-2643, p. 8 (La. 5/25/01), 788 So.2d 1173, 1178. As the Louisiana Supreme Court explained:

> Prescription commences when a plaintiff obtains actual
> or constructive knowledge of facts indicating to a
> reasonable person that he or she is the victim of a tort. A

---

[2] None of Ms. Granier's medical records are contained in the record before us.

> prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription.

*Campo v. Correa,* 01-2707, pp. 11-12 (La. 6/21/02), 828 So.2d 502, 510-11 (internal citations omitted). The *Campo* Court further indicated that, "[e]ven if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it *was reasonable* for the plaintiff not to recognize that the condition might be treatment related." *Id.*, p. 12, 828 So.2d at 511 (citing *Griffin v. Kinberger*, 507 So.2d 821 (La.1987))(emphasis supplied). "When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment ... then the facts and cause of action are reasonably knowable to plaintiff." *Champagne v. Brint*, 04-1128, p. 4 (La. App. 4 Cir. 1/19/05), 893 So.2d 119, 122 (quoting *Harlan v. Roberts*, 565 So.2d 482, 486 (La. App. 2 Cir.1990)).

Thus, "[t]he ultimate issue is the reasonableness of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *Campo,* p. 12, 828 So.2d at 511. As we noted in *Hurst*, findings of fact, such as the "discovery date" in a medical malpractice case, are subject to an manifest-error review, and "[t]he relevant issue in a manifest error inquiry is not whether the finder of fact was right or wrong, but whether its decision was a reasonable one.'" *Hurst*, 16-0934, p. 4, 220 So.3d at

8

126 (quoting *Marino v. Tenet Healthsystem Med. Ctr.*, 09-0915, p. 4 (La. App. 4 Cir. 11/24/09), 26 So.3d 297, 300).

Plaintiffs do not dispute that Ms. Granier was aware early on that she had suffered a bowel perforation; in her deposition testimony, she confirmed that she and her husband were aware of the bowl perforation as early as October 27 when she was transferred to another facility. They do, however, dispute their knowledge of Dr. Jones' alleged malpractice in failing to timely diagnose a bowel perforation and rely on the following excerpts from Dr. Carriere's September 28, 2011 deposition in support of their contention that Dr. Carriere advised Dr. Jones on October 2 that he had injured Ms. Granier's bowel:[3]

> Q:  When you initially spoke to Dr. Hogan on Friday, October 2nd, you did not believe that she had a bowel perforation [?][4]
>
> A:  I think what we did was we considered it. But, then again, Doctor Jones, which was the general surgeon that they consulted, indicated that he thought it was an ileus. And at that time they elected just to observe her.
>
> ***
>
> A:  . . . He [Dr. Jones] just asked me  - -  I basically told him what we did - - what I did intraoperatively.
>
> Q:  On September 29th?
>
> A:  That's correct. And me not being there, I'm certainly not going to override a physician who's - - who has more expertise with the gut than I do.

_____

[3] The record does not contain complete copies of depositions; it contains only portions which were attached to the various pleadings.

[4] Dr. Hogan was the physician covering for Dr. Carriere at that time who called Dr. Jones in for a consultation.

9

Q:     Did you have any conversation with Doctor Jones specifically about the denuded area that you had oversewn on September 29th?

A:     I told him we had adhesions.  And - - and that - - and that we had some adhesions.  I don't know if I expressed it as denuded.  But we had some adhesions that we had to take down on the sigmoid colon.

Q:     Did you tell him that you had oversewn the area?

A:     I may have.

Plaintiffs also rely on the following excerpts from Dr. Carriere's December 7, 2011 deposition in support of their position:

Q:     Did you discuss with them specifically the denuded area of the bowel?

A:     I specifically discussed with them the fact that they had some adhesions.  And that we had to take down some adhesions.  And I had oversewn some area, yes.

Q:     Okay.  Because at this point based on the patient's symptoms - - and when I say at this point, I'm talking about at the point where you're having the conversations with Doctor Jones and Doctor Hogan.  The potential diagnoses that they were discussing would be ileus or bowel perforation, correct?  Those would be the options?

A:     Correct.

Q:     And so I assume that the discussion was geared towards trying to determine which of those things was more likely, whether it was ileus or bowel perforation.

A:     I think the purpose was for me just to tell them the facts of what - - what occurred in this case.  Now, for - - for them to determine whether it's an ileus or a perforated viscous, you know, sort of - - sort of up to them to determine.  I wasn't present for that.

10

Q:     I understand.  But my question is a little broader.  Was the general nature of the discussion about what the potential diagnoses were, or was it more limited while you were present on the phone with just what happened when you did your laparotomy and - -

A:     It was more limited to what I did.

Q:     And was there any discussion with you and them about what her potential diagnosis was at the time?

A:     I think Doctor Jones had indicated because he had examined the patient that he felt it was an ileus.  I think that was the extent of the discussion on that.  I mean, like I said, I wasn't there.  I certainly couldn't make the diagnosis over the phone.

Q:     Did Doctor Jones specifically say in that conversation , I believe it's an ileus?

A.     I mean, his notes reflect what he told me.

Q:     Well, his notes reflect that he initially made the diagnosis of an ileus.

A:     Right.

Q:     And subsequently - -

A:     Right.

Q:     - - diagnosed a perforation.

A:     Right.

Q:     But they don't - - there are no notes that reflect a conversation with you.

Contrary to plaintiffs' position, this testimony does not establish that Dr. Carriere admitted to Dr. Jones that he had injured Ms. Granier's bowel during her initial surgery which would have caused a perforation.  To the contrary, he advised Dr. Jones that he found adhesions that he had "to take down" and had "oversewn"

11

the area (curiously, Dr. Carriere was asked during his deposition what he meant by "oversewn" but his response to this question was not contained in the deposition excerpts in the record).

It is clear that Dr. Carriere discussed with Dr. Jones the potential diagnoses and whether she was suffering from an ileus or a bowel perforation, but Dr. Carriere deferred to Drs. Jones and Hogan as it was "up to them to determine." Even Dr. Carriere did not believe Ms. Granier had a bowel perforation until October 3 (i.e., after the October 2 conversation upon which plaintiffs rely). When asked "when did [he] first suspect relative to September 29th that [Ms.] Granier had a bowel perforation," he indicated that it was "[w]hen [he] spoke with Doctor Hogan on the 3rd." He "wasn't too sure" about this on October 2, although it was a consideration. In a one-page excerpt of Dr. Jones' deposition included in the record, Dr. Jones testified that, while Dr. Carriere indicated that "there was a very, very minor denution of the serosa of the bowel . . . that . . . was repaired," "there were no other -- there were no other bowel manipulation that would create a bowel injury."[5] Dr. Jones confirmed "that he didn't do anything that should have resulted in a bowel injury," further corroborating that Dr. Jones did not definitively know on October 2nd that Ms. Granier was suffering from a bowel perforation and justifying his decision to initially treat her conservatively.[6]

---

[5] The one-page excerpt does not indicate when this conversation took place, and in fact, does not even identify Dr. Carriere as the person to whom Dr. Jones was referring. We assume that this pertains to the October 2nd conversation with Dr. Carriere.

[6] Indeed, the medical review panel found that "Dr. Jones did not initially feel that the patient exhibited compelling evidence of a surgical abdomen. Abdominal distention following an open procedure with hypokalemia could reasonably explain the patient's clinical presentation and justify Dr. Jones' initial decision to treat the patient conservatively. It was reasonable to delay surgical exploration for an adequate trial of conservative therapy."

Moreover, as the Supreme Court noted in *Campo* indicated, when the "discovery" of a malpractice claim is at issue, a patient has constructive knowledge of a claim when there is enough notice "to excite attention" and "call for inquiry," particularly in light of a patient's education and intelligence.

In this instance, in 2009, Ms. Granier had been a nurse for seventeen years; thus, as a medical professional, she possessed training and experience in the medical field that a lay person might not have had. She testified in her deposition that that she was aware that she had a bowel perforation no later than October 27, indicating that she spoke with Dr. Carriere during her two-month stay at St. Theresa's about her perforated bowel.[7] He explained to her "what he thought happened" – that she "might have had an ileus, where the bowel doesn't, actually, move for a while after surgery; and that once the ileus resolved, the thinned area perforated."

Ms. Granier's next statements are a key to the resolution of the issue presented in this case. When asked if she could recall anything else about her conversation with Dr. Carriere, Ms. Granier testified that "he couldn't understand why it got to that point;" that is, "why didn't they do something immediately." When asked who should have done something immediately, Ms. Granier replied, "the ER; and the doctors that were taking care of me . . . the Tulane's ER; the Tulane doctors."[8] This exchange signifies that Ms. Granier was put on notice, no later than November 29, 2009, sufficient to "excite attention" that there had been an allegedly unreasonable delay in the treatment of her perforated bowel. At the

---

[7] Ms. Granier testified that she was at St. Theresa's from October 27, 2009 through November 29, 2009.

[8] Dr. Jones treated Ms. Granier at Tulane-Lakeside Hospital, where she had been transferred.

least, the acknowledgement that they "didn't . . . do something immediately" indicates constructive knowledge of the facts allegedly giving rise to her claim against Dr. Jones, and sufficient "information or knowledge as ought to reasonably put [plaintiffs] on inquiry" and "to start the running of prescription." *Campo*, p. 12, 828 So.2d at 512.

We do not find the Third Circuit decision of *Andrus v. Patton*, 394 So.2d 714 (La. App. 3rd Cir. 1981), a case on which plaintiffs rely, to be persuasive. In that case, the plaintiff underwent what he was ultimately advised was an unnecessary surgery leading to various complications. After that surgery, he repeatedly returned to the physicians for follow-up care until he was told that there was nothing further that could be done and, when questioned as to "why he was experiencing so many post-operative difficulties and they informed him his problems were caused by a throat infection." *Id.*, at 17. When he sought treatment with several other physicians, all advised that his surgery had been unnecessary.

The *Andrus* Court found that "the plaintiff [could not] be held to have knowledge of his entitlement to bring a malpractice suit against the defendants until such time as he was informed nothing further could be done for him and he consulted with other medical practitioners who allegedly informed him that the second operation was unnecessary." *Id.* at 717. Its holding was based, in part, on the fact that the plaintiff was "neither well-educated nor knowledgeable in the procedures and techniques of modern medicine" and as such, the Court could not say that he "failed to exercise reasonable diligence in ascertaining the cause of his continued problems nor that he possessed more than a 'mere apprehension' that 'something was wrong.'" *Id.* at 717-18.

14

The *Andrus* case is not analogous to the instant matter. Unlike the *Andrus* plaintiff, Ms. Granier had medical training, and unlike *Andrus*, Ms. Granier had sufficient information to incite further inquiry as to whether her injuries resulted from Dr. Jones' failure to "do something immediately."

Based upon our review of the record before us, we cannot say that the trial court's decision was not reasonable and thus, we find no manifest error in the trial court's finding that the plaintiffs' action against Dr. Jones is prescribed.

**CONCLUSION**

For the reasons set forth more fully herein, we affirm the trial court's judgment granting the Exception of Prescription of Dr. Jones and Health Care Indemnity, Inc.

**AFFIRMED**